R. R. BARROW *v.* SHIELDS et als.

<span>13  57<br>e1091084</span>

1. A suit instituted upon a note before it is due has the effect of interrupting prescription so long as the suit lasts after the maturity of the note, even if it be ultimately dismissed upon an exception of prematurity.
2. A partial release of the mortgages and privileges of the creditor, releases the surety only *pro tanto.*

Defendants in a chancery suit in the United States Court were ordered, under a penalty, to file a cross-bill and bring in other parties against whom the complainant had demands, but whom he could not cite before the court, as they were citizens of the State with the complainant. These third parties answered by denying the jurisdiction of the court, and in case the plea was overruled setting up matters of defence to the complainant's demands. The Supreme Court of the United States decided, that the Circuit Court did not obtain jurisdiction over the parties in Louisiana cited in by the defendants, and the proceedings were dismissed. *Held by a majority of the court:* that these proceedings had the effect of interrupting the prescription as to all of the parties who answered the cross-bill within the period of prescription.

APPEAL from the District Court of the parish of Terrebonne, *Cole,* J.
George Eustis, E. Janin, Miles & H. Taylor, for plaintiff. Beatty & Bush and C. Roselius, for defendants and appellants.

BUCHANAN, J. The present appeal is a consolidation of five distinct suits instituted by the same creditor, in May, 1855, against two distinct debtors, and the representatives of three other debtors, deceased, upon the following twelve distinct evidences of debt:

1. A note signed by *William Bisland,* matured in all March, 1843.
2. A note signed by *William Bisland,* matured in all March, 1844.
3. A note signed by *Richard G. Ellis,* and endorsed by *William Bisland,* matured in all March, 1843.
4. A note signed by *Richard G. Ellis,* and endorsed by *William Bisland,* matured in all March, 1844.
5. A note signed by *George S. Guion,* and endorsed by *Van P. Winder,* matured in all March, 1843.

8

6. A note signed by *George S. Guion*, and endorsed by *Van P. Winder*, matured in all March, 1844.

7. A note signed by *Van P. Winder*, and endorsed by *George S. Guion*, matured in all March, 1843.

8. A note signed by *Van P. Winder*, and endorsed by *George S. Guion*, matured in all March, 1844.

9. A note signed by *William B. Shields*, matured in all March, 1843.

10. A note signed by *William B. Shields*, matured in all March, 1844.

11. A note endorsed by *William B. Shields*, matured in all March, 1843.

12. A note endorsed by *William B. Shields*, matured in all March, 1844.

The defendants plead the prescription of five years; but it is argued by plaintiff that prescription was interrupted as to all the defendants, and all the obligations above detailed, by a suit instituted by him in the Circuit Court of the United States for the Eastern District of Louisiana, on the 19th of December, 1842, and finally decided, on appeal, in the Supreme Court of the United States, at the December term of 1854, reported in 17th Howard, page 130.

Before examining the facts in relation to this interruption of prescription, it is proper to ascertain the principles of the law of Louisiana on the subject of the interruption of the prescription, operating a release from debt.

By Article 3516, taken in connection with Article 3484, it will be seen that prescription is interrupted by a citation to the debtor to appear before a court of justice, upon the demand of the creditor for a judgment for his debt. And it is immaterial, for the purpose of the interruption of prescription, whether the debtor be cited before a court of competent jurisdiction or not. Neither does any error in the form of the action, nor the rejection of the creditor's demand by the final judgment thereupon, have the effect of avoiding the interruption of the prescription resulting from the citation; for those clauses of the 2247th Article of the Code Napoleon which declare that the interruption of prescription is considered as "*non avenue*" if the suit be informal, or if the demand be rejected, have not been copied into our Code. The only portion of that Article adopted by our Legislature is the clause "si le demandeur se désiste de sa demande." See Louisiana Code, Article 3485.

Again, it is clear that prescription cannot be interrupted, until it has begun to run. If, however, a suit be instituted upon a note before it is due, and pending the suit the note matures and is protested for non payment, prescription of that note is interrupted so long as the suit lasts, after maturity, even if the suit be ultimately dismissed upon an exception of prematurity. The rule is "*actiones quæ tempore pereunt, semel inclusæ judicio, salvæ permanent.*" Marcadé, Prescription, Art. 2248.

Keeping these principles in view, we find that prescription is not interrupted as to any of the debts or any of the debtors included in the present consolidated action, by the original bill in Chancery filed by plaintiff on the 19th of December, 1842. Of all the present defendants, only one, *William Bisland*, was party defendant to that bill, and the prayer of that bill was not for judgment upon any of the notes included in this action. On the contrary, the prayer was for the annulling and avoidance of the contract which was the consideration of all these notes; which contract was set forth in detail in the bill.

On the 10th of February, 1844, plaintiff amended his bill in Chancery, with leave of the court, by discontinuing and abandoning his original demand in

nullity and rescission of the contract of the 9th November, 1842, and praying for the specific performance of the said contract, and that *William Bisland* might be decreed to pay plaintiff the amount of such of the notes signed and endorsed by said *Bisland* under the said contract (being the notes above described as Nos. 1, 2, 3 and 4), as may have been protested, and the protest notified to said *Bisland*, before the final decree in the suit. It will be remarked, that when this amended bill was filed, two of *Bisland's* notes (Nos. 1 and 3) were past due, and two (Nos. 2 and 4) were not yet due.

This amended bill of plaintiff was unquestionably an abandonment of his original demand, and a substitution in its place of an entirely new and directly opposite demand. As such it was held to be irregular and inadmissible by the Supreme Court of the United States in its reasons for judgment upon the appeal in that case. See 17th Howard, pp. 143 and 144. But it is not on that account the less effective under our law, for interrupting prescription, so far as concerns *William Bisland*, the only one of the present defendants against whom judgment is prayed for the amount of his notes and endorsements in the amended bill in question. Although informal, this amended bill interrupted prescription upon those notes, as to *Bisland*. It must be observed that the amended bill in question was served upon *Bisland* who appeared and moved to quash the same.

The next phase in this Chancery suit is a bill filed by the defendants in that suit, *William Bisland* and *Victoire Shields*, on the 8th of July, 1844, praying that the agreement or contract of the 9th of November, 1842, above referred to, might be specifically performed, and that plaintiff might be decreed to deliver up to be cancelled and annulled, all the promissory notes of *Thomas R. Shields*, on which said *William Bisland* and *Victoire Sields* were endorsers; and that said *William Bisland* and *Victoire Shields* might recover such damages from the plaintiff for his non-execution of the contract of the 9th of November, 1842, as should be proven. And the bill further prays for writs of *subpœna* to *Richard G. Ellis, Wm. B. Shields, Thomas R. Shields, George S. Guion*, and *Robert R. Barrow*, commanding them to appear and answer the premises and abide the judgment of the court upon said bill; which *subpœnas* were issued accordingly, and the parties named made appearance.

This bill cannot be considered as an interruption of prescription upon the notes now in suit in favor of plaintiff. In the first place, the parties *Bisland* and *Mrs. Shields*, who file the bill, claim no judgment of *Wm. B. Shields, Winder, Ellis or Guion*, upon the notes signed or endorsed by them; and as for *R. R. Barrow*, the holder of those notes, and the present plaintiff, he was so far from claiming anything in that bill, that he is actually sued therein for damages. See 17th Howard, 145, 146.

Afterwards, on the 5th of March, 1847, plaintiff, with leave of court, filed another amended bill, in which he set forth that *William B. Shields* was a citizen of Mississippi, and prayed that he might be cited and condemned to pay him the notes in principal and interest which are *endorsed* by said *William B. Shields*, (being the notes above described as Nos. 11 and 12).

To this amended bill, *William B. Shields* appeared and answered. Prescription is therefore interrupted as to the defendant, *William B. Shields*, upon the two notes endorsed by him and matured in March, 1843, and March, 1844.

Upon the other ground of defence pleaded by the defendants in these consolidated suits, namely, that the release by plaintiff of his mortgage on certain of

the slaves sold by him to *Thomas R. Shields*, had the legal effect of discharging the other parties to the contract of the 9th of November, 1842, from their obligations under that contract, it has been fully examined by the Chief Justice, with whose opinion upon that point the court unanimously concurs.

A difference of opinion upon the effect of the plea of prescription, as to the defendants, *William B. Shields*, *Van P. Winder*, and *George S. Guion*, has thrown upon me the duty of pronouncing the judgment of the court.

It is, therefore, ordered, adjudged and decreed, that the judgment of the District Court in the case of *Robert R. Barrow* v. *William B. Shields*, be reversed, and that *Robert R. Barrow* recover of *William B. Shields* four thousand seven hundred and sixty-six dollars and sixty-six cents, with interest at the rate of ten per cent. per annum on $2,383 33 from the 3d of April, 1843, and on $2,383 33 from the 3d of April, 1844, and costs of the suit of *R. R. Barrow* v. *William B. Shields* in the District Court, the costs of appeal in said suit to be paid by *R. R. Barrow*. And it is further adjudged and decreed, that the judgment of the District Court in the case of *R. R. Barrow* v. *Van P. Winder* be reversed, and that there be judgment against *R. R. Barrow* and in favor of the widow and heirs of *Van P. Winder*, made parties defendant therein, with costs of said suit in both courts. And it is further adjudged and decreed, that the judgment of the District Court in the suit of *R. R. Barrow* v. *W. A.* and *J. R. Bisland*, be affirmed, with costs. And it is further adjudged and decreed, that the judgment of the District Court in the suit of *R. R. Barrow* v. *R. E. Butler*, testamentary executor of *Richard G. Ellis*, be reversed, and that there be judgment in said suit in favor of defendant and against the plaintiff, with costs in both courts. And it is further adjudged and decreed, that the judgment of the District Court in the case of *R. R. Barrow* v. *George S. Guion*, be reversed, and that there be judgment in said suit in favor of defendant, and against plaintiff, with costs in both courts.

Mr. Justice COLE took no part in this decision.

MERRICK, C. J., dissenting. I am unable to concur in all the conclusions of my colleagues.

I adopt the statement of facts contained in the opinion of the Judge of the District Court in order to be better understood.

"On the 27th July, 1836, *Robert R. Barrow* sold to *Thomas R. Shields*, a sugar and cotton plantation, both in the parish of Terrebonne, the former on Bayou Terrebonne, the latter on Bayou Caillou, with all the improvements, &c., &c., and seventy-five slaves. This sale was made for the sum of $227,000, for which *Shields* gave sixteen promissory notes, and accepted drafts payable at various dates: the notes were secured by mortgage on the property sold.

"Immediately after the sale, *Shields* took possession of the property and paid some of the notes as they fell due, but he was unable to pay a great part of them, and in 1842 there was still unpaid the sum of $119,965 35. The unpaid notes had been protested as they fell due, and suit had been brought on them against *T. R. Shields* and against *Wm. Bisland*, the last endorser on all the notes.

In this state of things, *Shields* and his endorsers proposed to *Barrow* an amicable settlement of his entire claim. After some hesitation this proposition was accepted, and was finally concluded by an act passed before *Leufroy Barras*, Parish Judge of the parish of Terrebonne, on the 9th November, 1842, between *R. R. Barrow* of the first part, *Thomas R. Shields* of the second part, and the six endorsers of *Shields* of the third part.

These were *Mrs. Victoria Shields* and *Wm. Bisland*, of Adams County, Miss., *Wm. B. Shields*, *R. G. Ellis* and *Van P. Winder*, of Terrebonne, and *Geo. S. Guion*, of Lafourche Interior.

" According to this act, *Barrow* agreed to release *T. R. Shields* and his six endorsers from all liability on their notes and to discontinue his suits against *T. R. Shields* and *Bisland*. *Thos. R. Shields* retroceded to *Barrow* the property purchased by the act of July 27th, 1836, and the six endorsers gave .to *Barrow* their notes endorsed by each other, amounting to $32,000, to be delivered to *Barrow* when he gave up the unpaid notes, which had been given for the plantations, till then to remain in the hands of *L. Barras*, Parish Judge, &c.

" After entering into this contract, *Mr. Barrow* alleged that the other parties had made misrepresentations to him to induce him to do so, and that they also complained of the contract; he therefore sent them a letter offering to rescind it, which they declined to do.

" Alledging he was injured by the contract of 9th November, 1842, he filed a bill in equity in the Circuit Court of the U. S. for the Eastern District of Louisiana, against *Mrs. Victoria Shields* and *Wm. Bisland*, the only parties to the act of 9th November, 1842, who were not citizens of Louisiana, praying for a rescission of the act upon a number of grounds therein detailed at length.

" This suit was afterwards converted into a suit for the specific performance of the contract of 9th November, 1842, and on the notes for $32,000, given in said contract. All the parties to which act were made parties to the action, and after lingering on a number of years was terminated in the lower court by a judgment rendered on the 13th December, 1852, condemning the defendants in the present suit to pay their notes under the act of 9th November, 1842, and also to do other acts to which they had obligated themselves in said contract of 9th November, 1842.

" An appeal was taken, and the Supreme Court dismissed the case for want of jurisdiction. The plaintiff now brings these suits upon these notes, against those of their makers or endorsers, or their representatives, who reside in Louisiana.

" All the defendants are residents of the parish of Terrebonne, except *Geo.*, *S. Guion*, who has consented however to be sued in that parish. It is also agreed that all the suits may be tried together, and that the property of the part of the endorsers who are dead, descended as set forth in the petition.

" All the notes bore ten per cent. interest after maturity, and were payable at the Bank of Louisiana."

The defendants in their answer set up two principal grounds of defence:

" 1st. The notes signed and endorsed by the defendants in accordance with the terms-of the act of November 9th, 1842, were executed under the false and erroneous belief that they were still bound and liable for their original endorsements, when in fact they were in no manner bound for their endorsements, their liabilities having been released by *Barrow's* having released, without their knowledge or consent, certain of the mortgaged slaves from the mortgage given to secure the payment of said notes."

" 2d. They plead the prescription of five years."

The judgment of the lower court being adverse to the defendants on both grounds, judgments were rendered against them and they have appealed.

I will consider these defences in their order.

I. The defendants rely in support of this first ground of defence, that in April, 1837, *Thomas R. Shields* sold two slaves, (runaways,) to *Jacob Jacobs* for $1050, and *Barrow* released his mortgage as to them: also, in February, 1840, *Shields* sold another of his slaves to *Lydia Whitaker* for $150, and *Barrow* in April following released his mortgage upon the last mentioned slave.

On this branch of the case the learned counsel for the defendants have contended, that the effect of these releases was to discharge the defendants, the endorsers, from the remaining notes of the sale of 1836, amounting to, say $119,000; that being ignorant of their discharge, the contract of November 9th, 1842, was made in error, and void, and if the plaintiff would hold the defendants liable for the last mentioned notes the burden of proof is on him to show, and it must be shown that the endorsers were aware of their discharge at the time they entered into the contract of November 9th, 1842.

This contract was tripartite. *Thomas R. Shields* was to reconvey the plantations and slaves to *Barrow*, *Barrow* was to surrender to *Thomas R. Shields* all the notes then unpaid, release all parties therefrom and dismiss his suit against *Thomas R. Shields* and *William Bisland*.

The defendants, the parties of the third part, obligated themselves to pay thirty-two thousand dollars, "the consideration of the contract" secured by the notes now sued on.

It is evident that this was not a mere renewal for a former supposed obligation as in the case where an endorser promises to pay a note under the impression that it had been regularly protested, or where he has given a new promissory note for the same: for here on the part of the endorser his new obligation does not amount to one-third of the old.

Again, the *maker* of the old obligation is, by the agreement of the parties, discharged absolutely by the surrender of the property. The *endorsers* then assume his position and place, for the balance of his indebtedness after surrendering the property. If they are not bound, then the plaintiff loses thirty-two thousand dollars of his claim, for, by the agreement, *Thomas R. Shields*, (whose liability must on all sides be admitted,) was discharged, as just observed, from the remaining obligations which he had given as the price of the property.

The instrument of the 9th of November, 1842, must, therefore, be considered as a transaction, and subject to a rescission only for the same causes and inherent defects as other instruments of this kind. And so a part of these defendants considered it when they opposed *Barrow's* suit in chancery to set aside this agreement and reinstate the contract of 1836.

Have the defendants then established such facts as ought now to annul this contract which they were formerly so desirous of preserving in force?

Transactions have, between the parties interested, a force equal to the authority of things adjudged. They cannot be attacked on account of error in law, or any lesion. C. C., 3045. They can only be rescinded where there is error in the person or the matter in dispute, where there is fraud or violence, or where made in the execution of a title which is null, unless the nullity be the subject of the compromise, or unless the compromise be made upon forged documents. C. C., 3046, 3048, 1822, 1825.

The only one of these grounds which can be seriously urged in this case, is that the compromise was made in the execution of a void title. Let us see

to what extent the title was void. The title which was surrendered against *Thomas R. Shields*, as already observed, is admitted to have been valid. The use of that title as the consideration of the compromise, was not, for that reason, the execution of a void title.

But it is said that the release of the mortgage upon the three negroes specified, had the effect of discharging the endorser under Art. 3030 of the Civil Code, the creditor being unable to subrogate the endorsers to his mortgage, it being presumed that they would not have engaged themselves for their large amount, had they not thought they were bound as endorsers. A judicial construction has been put upon this Article of the Code, and it has been held, that the partial release of any of the mortgages and privileges of the creditor releases the surety only *pro tanto*. This construction, whatever we might think were the question *res nova* must govern us, and be considered as the settled law. See cases, *Saulet* v. *Trepagnier*,. 2 An. 429 ; *Gosserand* v. *Lacour*, 8 An. 75 ; and *Provan* v. *Percy*, 11 An. 179.

We must, therefore, conclude that the title, the subject of the compromise, was not void either as in regard to *Thomas R. Shields* or his endorsers. It is possible that the endorsers supposed themselves bound for $119,000, when they were only bound for $118,000, but this comparatively inconsiderable error in the amount of their indebtedness in the absence of all fraud, cannot invalidate a contract which our law declares shall have the force of a judgment. C. C. 1825, 3045. On this branch of the case, I think there is no difference of opinion among the members of the court.

II. Is the plea of prescription maintained ? More than five years elapsed between the maturity of the notes and the institution of the suit. Hence prescription has taken place unless interrupted. The plaintiff contends that certain proceedings in chancery had that effect, and I am of the same opinion, as to all of the defendants except one.

I attach no importance to the fact, that the proceedings were commenced before the maturity of the notes for the exception that the suit is premature, is only dilatory, and if waived by answer does not prevent a decision upon the merits. If the exception be not interposed the obligation becomes exigible, and the pendency of the suit must interrupt the prescription.

Neither is *citation eo nomine* essential to interrupt prescription. The Federal Court exercising chancery jurisdiction, commences its proceedings by a subpœna. We must, where it has concurrent jurisdiction with our courts at least, consider the subpœna equivalent to a citation. *Jackson* v. *Tiernan*, 15 L. R. 485. So also where a citation is waived and the party voluntarily appears in court by answer or otherwise, the same effect must be given to the proceeding as would be given had the answer or plea been preceded by a citation. C. P. 177. A reconventional demand has the like effect, because no citation is required, the party being already in court. *Driggs* v. *Morgan*, 10 Rob. 119. Under the Roman law it was the *contestatio litis* which interrupted prescription. The joining of issue cannot have a less effect with us, for it either presupposes a citation or the waiver of citation. C. P. 359.

I will now consider the proceedings in the Circuit Court of the United States for the Eastern District of Louisiana, for it is only as to the effect of these proceedings with regard to a part of the defendants that there is a division of opinion among the members of the court.

In December, 1842, the plaintiff in this action, *R. R. Barrow*, filed his bill in

chancery in the the Circuit Court of the United States, against *Mrs. Victoire Shields* and *William Bisland*, alleging that *Thomas R. Shields, Richard G. Ellis, William B. Shields, George S. Guion* and *Van P. Winder*, were citizens of Louisiana, and, therefore, could not be made parties to the bill, and praying that the contract of November 9, 1842, might be declared to have been improperly procured, and be annulled and set aside.

*Mrs. Shields* and *William Bisland*, by their answers, resist the demand of the plaintiff for a rescission of said contract, and aver it was entered into in good faith. *Mrs. Shields* denies that that there was "anything in the conduct of said *Thomas R. Shields*, or that of any of the endorsers, to induce the complainant to believe any of them were preparing pretexts to justify their intended refusal of payment of their aforesaid notes, amounting to $32,000."

*Bisland* averred that he and his coëndorsers agreed to pay plaintiff $32,000 to induce him to take back the property ; that he, *Bisland*, although the last endorser, had consented to pay $10,000 as his portion of $32,000.

On the 4th day of March, 1843, *William Bisland* filed his cross-bill against *Barrow*, setting up the contract of November 9th, 1842, and the promissory notes executed in pursuance of it, and praying a specific performance of said contract, and for an injunction against *Barrow*, restraining him from proceeding upon the suits in the First District Court and in the District Court of the parish of Terrebonne, and from commencing any other proceedings against him, said *Bisland*, on the notes under the contract of 1836. On the 18th of April, 1843, the six matured and protested notes were ordered, on the motion of *Janin*, of counsel for *Barrow*, to be deposited in court by the notary having them in possession for the purpose of protest.

In 1844, (February 10) *Barrow* filed his amended bill, and prayed that the promissory notes executed by the defendants under the Act of November 9, 1842, and deposited under that agreement with *Burras*, the parish Judge, before whom the contract was passed, should be delivered to him, and prayed "that the defendants may be decreed to pay to plaintiff the amount of such of the last mentioned notes as may have been drawn by them, and also such of said notes as may be endorsed by them, and which may be protested, and of the protest of which they may be notified before the final decree of this honorable court, the whole with interest from the day of protest."

On the same day, *Barrow* filed his answer to the cross-bill of *Bisland*, in which the indebtedness of *Bisland* upon the protested notes is set up ; and it was further alleged, that on the 3d day of April he would be indebted on the notes which would then mature, in the further sum of $8,483 33, and costs of protest.

The prayer to this was, that the said contract of November 9, 1842, be specially performed according to the time, purport and tenor of said act, and he prays for such relief as by the showing of his answer he is entitled, concluding with a prayer for general relief.

On the same day, the court ordered *Barras*, the parish Judge, having the custody of the second series of notes, to deposit them with the Clerk of the Circuit Court, to be by him deposited in bank for collection.

On the 24th day of April, 1844, the court ordered, that unless *Mrs. Shields* and *William Bisland* filed a cross-bill, setting up and praying an execution of said second contract, and make all the parties to said second contract defendants, that said *Barrow* should be at liberty to proceed upon his bill of com‿

plaint for a specific performance of the *original* contract between the parties. The cross-bill was accordingly filed in July, 1844, wherein the said *Mrs. Shields* and *Mr. Bisland* made *Richard G. Ellis, William B. Shields, Thomas R. Shields, George S. Guion,* and *Robert Barrow,* defendants, praying for a specific performance of the contract of November 9, 1842, and for such damages for the non-execution thereof by *Barrow,* as shall be proven, and that all the promissory notes of *Thomas R. Shields,* upon which they were endorsers, be given up to be cancelled.

The defendants, *Richard G. Ellis, Van P. Winder* and *George S. Guion,* filed a plea to the cross-bill of *Shields* and *Bisland,* in the nature of an exception to jurisdiction of the court, and also averring that no cause of action was alleged against them. *Mrs. Shields* and *Bisland,* at the same time demurred to the original bill.

The plea and demurrer were at the May term, 1845, overruled, and the parties making the same were directed to answer over.

In pursuance of this order, *Mrs. Shields* and *William Bisland* answered *Barrow's original* bill, and, among other things, averred : " That no legal demand of payment could be made, and they deny that any legal protest for non-payment or notice thereof was ever made, and they, therefore, *say that they are fully discharged from all liability on account of said notes ;* and they pray, if this court shall entertain jurisdiction of said complainant's demand, it may order said notes, as well those signed as maker as those endorsed by your respondents, to be cancelled and given up to them."

They further averred, that *Barrow* was responsible for the revenues of the plantation, and prayed, in the event their defences were held insufficient, " *that then the amount of revenues received by said complainant or the amount which he might, with proper management, have received, be imputed by this court to the payment and discharge of all your respondent's liabilities under said contract of November,* 1842, *and the notes given in pursuance thereof.*"

*Van P. Winder* and *George S. Guion* appear, plead and answer the cross-bill of *Mrs. Shields* and *William Bisland,* and then *they plead to the bill of complaint of Barrow,* the want of jurisdiction, and in the event the court should be of the opinion that their pleas (to the cross-bill and original bill) ought not to be sustained; they set up, in substance, the same matters as a defence to the notes, as were set up by *Mrs. Shields* and *William Bisland.*

*William B. Shields* having, by his plea to the cross-bill of *Mrs. Shields* and *Bisland,* averred his residence to be in Mississippi, *Barrow* amended his bill in March, 1847, praying that he be condemned to pay the notes *endorsed* by him and described in the bill of complaint, and also conclude by a prayer for general relief.

*W. B. Shields* thereupon answered the original and amended bills, and averred that he was discharged from the notes signed by him and those endorsed by him, by the release of the mortgage upon the slaves *Prince* and *Joe,* and the irregularity in the protest of the notes, &c.

*Willam B. Shields* further denied all liability on the four notes *signed* by him under the contract of 1842, on the further ground that they were delivered as *escrows* and were not to be delivered to complainant until he had first performed the stipulations on his part, and that he had neglected to perform the same. He further avers that said notes have never been legally or properly pro-

BARROW
*v.*
SHIELDS.

tested, and "as to the two upon which he is endorser, he is wholly discharged for want of legal protest and notice," and "as to those of which he is drawer, no legal demand was or could be made, because at the time they *were presented and protested for non-payment*, they were not the property of the complainant nor had any person the right to demand or receive payment thereof."

On the 31st of January, 1852, *Barrow* filed his replication to the answers of *William Bisland, Mrs. Shields* and *W. B. Shields*, and conditionally as to *Guion, Winder* and the executor and widow of *Ellis.*

*Ellis*, as has already been observed, pleaded to the jurisdiction of the court in reply to the cross-bills of *Mrs. Shields* and *William Bisland.* Of course, the cross-bill was no demand for the payment of the notes, and by that act, *Ellis* did not become a party to *Barrow's* bill. It was not until January, 1852, that *Richard E. Butler*, testamentary executor, and the tutrix to the minor children, made their appearance and answered the *original* and cross-bills, setting up substantially the same defences as *Winder* and *Guion* had previously done.

By signing the promissory notes and delivering them to *Barras, Ellis* had complied with that part of the contract and from that period until filing answer to the original and cross-bills, neither he nor his representatives appear to have done any act to prevent *Barrow* from receiving from *Judge Barras* the notes and enforcing them by suit.

A consideration of the facts here shown proves, that the *contestatio litis* was formed by all of the defendants, except *Richard G. Ellis*, within five years from the protest and maturity of the notes given under the contract of Nov. 9th, 1842.

Upon the validity and obligatory force of said promissory notes, both as to the makers and endorsers, and their liability to pay the same, and upon a consideration of the issue thus formed, the Circuit Court rendered a decree in favor of *Barrow* for the amount of the notes, respectively against *Victoria Shields, William B. Shields, Van P. Winder, George S. Guion, William Bisland*, and the executor, widow and heirs of *Richard G. Ellis*, deceased. Code, Const. 1, Lib. 3, Tit. 9.

This decree of the Circuit Court was reversed by the Supreme Court of the United States in December, 1854, on the ground, that the defendants were not lawfully before the court, that the court never obtained jurisdiction over those of the parties who were citizens of Louisiana, and, that it did not have before it such parties as were indispensable for a specific performance of the contract of compromise, or the rescission thereof; and, lastly, that when the Circuit Court proceeded finally to make a decree condemning the defendants to pay the notes given under the compromise, it gave a relief for which there was a plain, adequate, and complete remedy at law.

Now, if the defendants had not prosecuted their appeal to the Supreme Court of the United States, and there caused the decree of the Circuit Court to be reversed, it would have had the force and effect of the thing adjudged, and would have been conclusive upon them as to their obligation to pay the notes. I am, therefore, inclined to think that the proceedings in the Circuit Court of the United States ought not to be treated as *corram non judice* with reference to the question of prescription, although it erroneously assumed jurisdiction over matters and persons not properly cognizable by that court.

The irregular manner in which the parties were brought into court cannot affect the case, for few defendants voluntarily appear in courts of justice.

The *contestatio litis* was formed, as I think as to each defendant, either by an express claim in the bill on the part of the plaintiff upon the notes or an express denial upon the binding force of the notes and their liability thereon, by each of the defendants in the answer and a replication thereto by the plaintiff, and in some of the cases there were both an affirmance by the one party and a denial by the other, followed by the replication, and this issue of fact thus formed was entertained by the Judge. *Lis enim videtur cum judex per narrationem negotii causam audire coeperit.*

This *contestatio litis* was formed, as already observed, as to each of the defendants within five years from the maturity of the notes, except as to *R. G. Ellis.* As to him, I do not think the proceedings can have the effect of interrupting prescription.

In 1844 the court ordered the notes to be deposited in bank for collection. We see no reason why suit could not have been instituted upon the notes in the name of the bank, or any other receiver which the court might appoint. Perhaps also *Barrow* himself might have sued upon them as well then as now. At all events, neither *Ellis* nor his representatives appear to have done anything to prevent *Barrow* from suing upon the notes until they formed the *contestatio litis* by their answer in 1852. Up to this time they stood upon their rights as simple makers of the notes. In the meantime, the five years elapsed.

The maxim: *Contra non valentem agere non currit prescriptio* does not apply to *Barrow* on his demand against *Ellis.* The latter did not stand in this respect in the same position as the other defendants, who, in their answers within the five years, contested the plaintiff's right of recovery upon the notes sued upon, and the judgment as to *R. E. Butler,* executor, I think ought to be reversed.

I, therefore, concur in the decrees pronounced in the cases of *R. R. Barrow* v. *R. E. Butler, executor,* and same v. *W. A. & J. R. Bisland,* and dissent in the other consolidated cases.

---

ON A RE-HEARING.

MERRICK, C. J. The discussions which the re-hearing has given rise to in this case, have not occasioned any material change in my opinion.

I am still unable to see any safe ground upon which the succession of *Ellis* can be held responsible.

I can see nothing which in my opinion can be held to be equivalent to a citation or a demand in justice, until after prescription had been acquired.

It is said that the cross-bill filed by *William Bisland* and *Victoria Shields,* was a sufficient citation or "demand in justice," to interrupt the prescription as to *Ellis,* because *William Bisland* was the endorser of *Ellis* upon that series of notes, and, that, therefore, he was interested in bringing him into court, in order that judgment might be rendered against him as maker, if rendered against *Bisland* as endorser.

As *Barrow* did not undertake to make *Ellis* a party to his bill, and did not pray for a subpoena or judgment against him, the case as to *Ellis' Succession*

must rest upon the character of the cross bill alone. It must, therefore, be examined. What does it contain? If it interrupts prescription, *Bisland* must have alleged that he was the agent of *Barrow*, and that he demanded payment of the promissory notes in *Barrow's* name, or that *Barrow* had sued him as endorser, and he demanded judgment against *Ellis*, as his warrantor, in case he should be condemned. Because nothing short of this is a citation *on account of the notes.*

But on looking into the cross-bill, instead of finding such a demand, we only find that the contract of 1842 is recited at length, and *a prayer for its specific performance*, and no demand in any shape for judgment upon the notes. The subpœna is not in the record, but it must have followed the cross bill as usual.

What is the meaning of the prayer for a specific performance is ascertained by the decree of the Supreme Court upon this very cross-bill. See 17 Howard, 146. Indeed, the complainants sufficiently explain themselves when they say, that they are ordered to bring in by their cross-bill, *Ellis, Winder* and *Guion*, with a view to the specific performance of the contract of 1842, and when, also, they pray that the notes given under the sale of 1836, on which they were endorsers, may be cancelled, and that they may recover damages *against Barrow for his non-execution of his contract.* It is also known, that the cross-bill was filed to avoid the danger arising from the threat of the Circuit Court to allow *Barrow* to set up the sale of 1836.

In all this I do not discover any demand formed upon the *promissory notes.* There was no citation to *Ellis*, requiring him to pay them, and nothing that informed him that they were set up against him by any one. Moreover, such a demand in a cross-bill (in which *Barrow* himself was defendant) would have been most singular, as that court had no jurisdiction upon ordinary demands upon commercial paper, there being a remedy at law, and no pleadings between the several defendants to the cross-bill.

In my opinion it was by the *answers* of *Winder* and *Guion* to *Barrow's* bills and not to the cross-bill, which interrupted prescription as to them. As already remarked, neither *Barrow* nor any one else on his behalf had as yet demanded judgment against them on account of the notes. But these defendants, in answering *Barrow's* original and amended bills, assumed that it was a demand, irregular it is true, but nevertheless a demand against them for the amount of the notes and in this sense they denied *Barrow's* right to recover against them upon the notes, and prayed that they might be declared extinguished. By the replication filed by *Barrow*, the issue was formed which the parties and the Circuit Court understood as embracing *Barrow's* right to recover upon the notes, and the defendants' defences against them.

But it is suggested, that this view substitutes the answer for that citation, and declares, what the law has not said, that an answer can interrupt prescription.

The reconvention which comes by way of answer, interrupts prescription without any citation. And I cannot see why the defendants in this irregular chancery suit, who chose to assume that the plaintiff had in said suit demanded payment of the notes when such demand was never in fact made as to all of the parties, should now, on account of the irregularity of such proceedings, deny the demand which they had undertaken to answer, and which they did answer when they prayed that the notes should be cancelled or, at least, com-

pensated by the fruits received from the plantation by *Barrow*. Although they never were actually cited on account of the notes, they admitted, by their defence, that they were cited equally with those defendants who were cited, and when the plaintiff filed his replication, the issue was formed which prevented the defendants who had so answered; from ever denying that they had been sued on account of the notes. What the parties and the court understood as embraced in the pleadings, is apparent from their management of the suit and the decree of the Circuit Court which affirmed the plaintiffs' right to recover. And if there is nothing else in the record equivalent to a citation, the answers of these defendants virtually admit that a judicial demand was made of them for the payment of the notes, and from that time forth they are estopped from asserting that they had not been cited.

But it is further urged, that *Ellis*' plea was overruled, and that he was ordered to answer over to *Barrow's* bill, and, therefore, he was constructively in court as well as his succession from the date of the overruling of his plea.

Whether such is the effect of a proceeding in chancery after the death of parties, it is not necessary to inquire; for it is clear, that the cross-bill was not *Barrow's* bill, and no issue could be formed on *Barrow's* bill until the parties were forced to answer by the machinery of the cross-bill.

The Circuit Court, in this curious proceeding, knew that it could not compel *Ellis*, *Winder* and *Guion*, to answer *Barrow's* bill, because they were, with him, residents of Louisiana. But it supposed that, by compelling *Bisland* and *Mrs. Shields* to file a cross-bill against them, it would then have jurisdiction over their persons in virtue of the cross-bill and could thus force them to answer *Barrow's* bill for a specific performance. When, therefore, the plea of these defendants was overruled, the court decided one branch of a controversy between the parties to the cross-bill, and not a contest between themselves and *Barrow*. That issue could only be formed when the court had exerted its power at the instance of *William Bisland* and *W. Shields*, to compel them to answer *Barrow's* bill.

*Ellis* having died, his representative was not forced to answer, and did not answer *Barrow's* bill until 1852, after prescription had extinguished the liability of *Ellis*' *succession* upon the notes.

But it is further objected, that *Bisland* is the accommodation endorser of *Ellis* and, therefore, the citation on him must interrupt prescription, because when *Bisland* pays the judgment, he will have his recourse over against *Ellis*' estate. Whether such will be the effect of payment or not, we are not called upon to decide. The question here is between *Ellis*' *succession* and the plaintiff. On this point, the authorities leave no room to doubt that the citation against the endorser does not interrupt prescription as to the maker. 12 Rob. 185, *Jacobs* v. *Williams*; 2 An. 382, *Jacobs* v. *Newcomb*; Ibid 792, *Hickman* v. *Stewart*.

We all concur that the judgment heretofore pronounced by this court in the case of *Robert R. Barrow* v. *W. A. & J. R. Bisland*, remain undisturbed.

I concur with Justice VOORHIES and BUCHANAN, that the decision heretofore pronounced by this court in the case of *Robert R. Barrow* v. *Richard E. Butler*, executor of *R. G. Ellis*, remain undisturbed. And I concur with Justices SPOFFORD and COLE, that in the other three cases of this plaintiff against *W. B. Shields*, *Van P. Winder* and *George S. Guion*, that judgment of this court ought to be set aside, and the judgments of the lower court affirmed.

It is, therefore, ordered, adjudged and decreed by the court, that the judg-ment heretofore pronounced in said case of *Robert R. Barrow* v. *W. A. & J. R. Bisland*, and the judgment in the case of *R. R. Barrow* v. *Richard E. Butler*, executor of *R. G. Ellis*, heretofore pronounced by this court, remain un-disturbed; and that the judgments pronounced by this court in the cases of *Robert R. Barrow* v. *William B. Shields, Robert R. Barrow* v. *Van P. Winder*, and *Robert R. Barrow* v. *George S. Guion*, be set aside and annulled. And it is now ordered, adjudged and decreed, that the judgments of the lower court in said cases, viz: *Robert R. Barrow* v. *William B. Shields, Robert R. Barrow* v. *Van P. Winder, Robert R. Barrow* v. *W. A. & J. R. Bisland*, and *Robert R. Barrow* v. *George S. Guion*, be affirmed, and that the defendants pay the costs of both courts.

Messrs. Justices VOORHIES and BUCHANAN adhered to their former opinions pronounced in this case.

SPOFFORD, J. In the opinion heretofore pronounced in this cause by a majority of the court, it was stated that prescription was interrupted by a citation to the debtor to appear before a court of justice *upon the demand of the creditor for a judgment for his debt.* And as in the chancery proceedings, the creditor, *Barrow*, had not demanded a citation and judgment against *Van P. Winder, R. G. Ellis* and *George S. Guion*, nor prayed expressly for a judgment against *W. B. Shields*, upon the notes subscribed by him, prescription was held not to have been interrupted as to those parties.

In this, I have been satisfied by further examination, that too much prominence was given by a majority of the court to the fact, that *Barrow* himself did not directly cause the parties above named to be summoned to take part in the litigation commenced by him in the federal courts and prosecuted so long, so irregularly, and so fruitlessly.

The Code puts stress upon the citation of the party, not upon the manner of the citation or the person at whose instance it may be ordered. "A legal interruption takes place, when the possessor has been cited to appear before a court of justice, *on account either of the property or of the possession;* and the prescription is interrupted by such demand, whether the suit has been brought before a court of competent jurisdiction or not." It would seem that the interruption takes place whenever the debtor is brought into court, no matter how irregularly or improperly, to answer *on account of the debt*, in a suit to which the creditor is also a party. Under a similar textual provision, it has been held in France, that the appearance of a warrantor in a cause cited only at the instance of the defendant, if he sets up a defence to the plaintiff's demand, will interrupt the prescription pleadable by the warrantor against the plaintiff. Dalloz, 32, 1, 164.

Upon the same principle it would seem that, when parties are called in by defendants with whom they are equally interested to defeat the plaintiff's demand, and when they actually do contest his demand, prescription must be interrupted as between them and the plaintiff.

*Van P. Winder, George S. Guion* and *William B. Shields*, subpœnaed at the instance of the original defendants with whom they were equally interested to defeat the plaintiff, did, by their answers in the chancery suit, put at issue *Barrow's* right to recover an account of the notes now sued upon, and before prescription had accrued. It was thereby interrupted as to those parties with regard to all their liabilities upon the notes in question.

The case of *R. G. Ellis* differs only in the fact, that neither he nor his representatives answered to the merits of *Barrow's* bills, until after prescription had accrued. But *Bisland*, who prayed for a subpœna to bring him into court, that the contract with *Barrow* to which they were both parties, might be specifically executed, was the endorser of the notes given by *Ellis*. He had a direct interest, therefore, in bringing him before the court, that judgment might be given against the maker, if he himself were liable as endorser. *Ellis* appeared and pleaded that that he was not bound to answer *Barrow's* bill of complaint; this was on the 6th of December, 1844. The plea was overruled, *Ellis* died, and his representatives were made parties, and answered to the merits in 1852. As they were constructively in court all this time upon a citation calling upon them to answer *Barrow's* bills, I think it must be held that prescription was interrupted as to them, unless it is the *answer* and not the *citation* which interrupts prescription.

Upon this point the Code is positive ; and the claims of *Barrow*, to which *Ellis* was cited to answer at the instance of a party in interest, involved an assertion of *Ellis'* liability upon the notes now in question, by necessary inference. And, under the prayer for general relief, the Circuit Court actually gave judgment in favor of *Barrow* against *Ellis'* representatives for the sums now claimed. *Une demande implicite est interruptive de la prescription, aussi bien qu'une demande expresse.* Sirey 6, 2, 696.

All the parties to the extraordinary litigation in the Circuit Court, evidently thought that the liability of each of the defendants in this suit upon the notes was there at issue. I, therefore, think our judgment heretofore rendered, should be set aside, and the judgment of the District Court in all these cases, be affirmed with costs.

COLE, J. I concur with Mr. Justice SPOFFORD for the reasons given by me as District Judge.

On the 27th July, 1836, *Robert R. Barrow* sold to *Thomas R. Shields* a sugar and a cotton plantation, both in the parish of Terrebonne, the former on Bayou Terrebone, the latter on Bayou Caillou, with all the improvements, &c., &c., and seventy-five slaves. This sale was made for the sum of $227,000, for which *Shields* gave sixteen promissory notes, and accepted drafts payable at various dates : the notes were secured by mortgage on the property sold.

Immediately after the sale, *Shields* took possession of the property and paid some of the notes as they fell due; but he was unable to pay a great part of them, and in 1842 there was still unpaid the sum of $119,965 35. The unpaid notes had been protested as they fell due, and suit had been brought on them against *T. R. Shields*, and against *Wm. Bisland*, the last endorser on all the notes.

In this state of things, *Shields* and his endorsers proposed to *Barrow* an amicable settlement of his entire claim. After some hesitation, this proposition was accepted, and was finally concluded by an act passed before *Leufroy Barras*, Parish Judge of the parish of Terrebonne, on the 9th November, 1842, between *R. R. Barrow* of the first part, *Thos. R. Shields* of the second part, and the six endorsers of *Shields* of the third part.

These were : *Mrs. Victoria Shields* and *William Bisland* of Adams County, (Miss.), *Wm. B. Shields*, *R. G. Ellis* and *Van P. Winder*, of Terrebonne, and *Geo. S. Guion*, of Lafourche Interior.

According to this act, *Barrow* agreed to release *T. R. Shields* and his six endorsers from all liability on their notes, and to discontinue his suits against *T. R. Shields* and *Bisland*. *Thos. R. Shields* retroceded to *Barrow* the property purchased by the act of July 27th, 1836, and the six endorsers gave to *Barrow* their notes endorsed by each other, amounting to $32,000, to be delivered to *Barrow* when he gave up the unpaid notes, which had been given for the plantations; till then to remain in the hands of *L. Barras*, Parish Judge, &c.

After entering into this contract, *Mr. Barrow* alleged that the other parties had made misrepresentations to him to induce him to do so, and that they also complained of the contract; he therefore sent them a letter offering to rescind it, which they declined to do.

Alleging he was injured by the contract of 9th November, 1842, he filed a bill in equity in the Circuit Court of the United States for the Eastern District of Louisiana, against *Mrs. Victoria Shields* and *Wm. Bisland*, the only parties to the act of 9th November, 1842, who were not citizens of Louisiana, praying for a rescission of the act upon a number of grounds therein detailed at length.

This suit was afterwwards converted into a suit for the specific performance of the contract of 9th November, 1842, and on the notes for $32,000, given in said contract. All the parties to which act were made parties to the action, and, after lingering on a number of years, was terminated in the lower court by a judgment rendered on the 13th December, 1852, condemning the defendants in the present suit to pay their notes under the act of 9th November, 1842, and also to do other acts to which they had obligated themselves in said contract of 9th November, 1842.

An appeal was taken, and the Supreme Court of the United States dismissed the case for want of jurisdiction. The plaintiff now brings these suits upon these notes, against those of their makers or endorsers, or their representatives, who reside in Louisiana.

All the defendants are residents of the parish of Terrebonne, except *George S. Guion*, who has consented, however, to be sued in that parish. It is also agreed that all the suits may be tried together and that the property of the part of the endorsers who are dead, descended as set forth in the petition.

All the notes bore ten per cent. interest after maturity, and were payable at the Bank of Louisiana.

Having given this statement of facts, we would remark that the principal grounds of defence are, 1st, the release of mortgage on *Charles, Primus* and *Joe Ogden*, though it does not appear clearly that the mortgage on *Charles* was ever actually raised, and 2d, prescription.

And I shall now proceed to investigate this defence and see if it is valid and sufficient.

One of the grounds of defence is that a mortgage bearing on the slaves *Charles, Primus* and *Joe* was raised by *Barrow*.

These servants were among those sold by *Barrow* to *Thos. R. Shields* by the sale of 27th July, 1836. *Charles* was sold by *Shields* by private act, on the 27th of February, 1840, to *Lydia Whittaker, f. w. c.*, his grandmother. *Barrow*, on the 29th April, 1840, wrote under said act, that he does now and will raise the mortgage on said *Charles*. The boys *Primus* and *Joe Ogden* are stated in the bill of sale to *Shields* to be absent from the plantation from having run away, are supposed to be in the vicinity and are at the risk of *Shields*

as regards their being run away. The sale of *Charles* was recorded in the Parish Judge's office of Terrebonne, on the 24th August, 1840. The evidence establishes they were runaways, and in the bill of sale from *Thos. R. Shields* to *Jacob Jacobs*, on the 3d of April, 1837, it is averred they were runaways. *Charles* was sold for one hundred and fifty dollars and *Primus* and *Joe* for one thousand and fifty dollars.

Barrow, on the 11th of April, 1837, by public act, before the Parish Judge of Terrebonne, raised the mortgage on *Primus* and *Joe Ogden*, it having been agreed in said sale of 3d April, 1837, by said *Thos. Shields*, that this should be done, and said act was recorded in said Parish Judge's office on the 11th of April, 1837.

Now it is alleged by defendants that they were entirely released from all legal obligation to pay their endorsements on the notes given for the price of the plantation by sale of 27th July, 1836, on account of the lifting of said mortgage, and if they had known the fact and that they were released by the actions of *Barrow*, they should not have entered into the compromise of November 9th, 1842.

In investigating the effect of said release of mortgage, the first question that arises is, whether the release of said mortgage was known to the endorsers. The presumptive evidence is in favor of the hypothesis, that the endorsers knew of the raising of the mortgage previous to the time of passing of the Act of 9th November, 1842. These gentlemen would not have endorsed for *Thos. R. Shields* for such large amounts unless they were on terms of very great intimacy with him. *Wm. B. Shields* was a witness to the sale of *Charles* and brother to *Thos R. Shields*.

It is true that in said sale *Charles* is sold subject to the mortgage of *Barrow*, but he must have known that the sale would be of no practical avail unless the mortgage was raised. *G. S. Guion* resided in the parish of Lafourche, *Van P. Winder* in Terrebonne, *R. G. Ellis* lived in Terrebonne.

*Thos. R. Shields* and *Wm. Bisland* were brothers-in-law. Taking into consideration the relation of the parties, it is very natural to suppose that these sales of *Charles* and of *Primus* and *Joe* must have been spoken of by *Thos. R. Shields* to the endorsers.

Besides, the sale from *Thos. R. Shields* to *Jacob Jacobs* was made by public act in New Orleans on the 5th April, 1837, and recorded in the Parish Judge's office of Terrebonne on the 11th April, 1837, and the release of the mortgage by *Barrow* was recorded in the said Parish Judge's office on the 11th of April 1837 ; the sale of *Charles* was recorded in the Parish Judge's office of Terre- bonne on the 24th of August, 1840.

Now, the act of compromise of 9th November, 1842, was passed before the same Parish Judge, *L Barras*, and as the matter of this compromise was talked over some time before the act was passed, and these acts had been on the pub- lic records of the parish of Terrebonne, the release of mortgage for about five years and the sale of *Charles* over two years, and as a part of the endorsers lived in Terrebonne, it is difficult to imagine that nothing was ever known to them of these sales and the release of mortgage on *Primus* and *Joe*. Besides, *Primus* and *Joe* were sold as runaways, *Thos. R. Shields* no doubt desiring to rid his plantation of them, and this sale must certainly have been talked over before, and it does not seem probable that *Barrow* would have released the

10

mortgage on *Primus* and *Joe* unless he had first been certain that his rights under the sale of 27th July, 1836, would not be affected thereby.

Besides, *Mrs. Victoire Shields*, in her answer, filed March 4, 1843, says, in speaking of the state of property of *Thos. R. Shields*, previous to the compromise of November 9th, 1842:

That although a few of the negroes were dead and *and had been sold*, whose names are mentioned in the complainant's bill, the property had been greatly improved by valuable improvements put upon it by the said *Shields*. On p. 16, in her answer to *Barrow's* bill, she further says: "and this defendant further saith that she has been informed and believes that the said complainant, previous to the execution of said agreement, gave a memorandum in his own hand writing to one of the endorsers, in which the said complainant himself had set down the names of these same negroes as being then dead, with the names of *two others which had been sold* and one exchanged, which memorandum, with proof of its being in the handwriting of the said complainant, this defendant is ready to produce." And *Wm. Bisland*, in his answer, filed March 4th, 1843, repeats exactly what *Mrs. Victoire Shields* says as to the memorandum. From these averments of the pleadings of these two endorsers, which are under oath, it appears that *Barrow* gave the name of two that had been sold. These were no doubt *Primus* and *Joe Ogden*, for the only other one sold was the child *Charles* to which sale *Wm. Shields* was a witness. Although these averments may not be considered as binding any one in particular, still as this memorandum was given to one of the endorsers previous to the execution of the agreement of November 9th, 1842, is it not reasonable to suppose that this endorser communicated the fact to the endorsers, and this fact of a sale supposes the raising of the mortgage, for no one would have bought them subject to that mortgage, and in examining the sale in the Parish Judge's office of Terrebonne, they would also have seen the release of the mortgage.

Without then taking into consideration at all the evidence of *Lydia Whittaker*, there is strong presumptive testimony that the endorsers under the act of 27th July, 1836, were aware of the sales of *Charles*, *Primus* and *Joe*, and of the release of the mortgage on *Primus* and *Joe;* assuming, however, that they were all ignorant of these sales and of the raising of any mortgage on said slaves, what effect would this release of mortgage have had on the liabilities of the endorsers to the act of 27th July, 1836? Would they have been entirely or partially released? It is contrary to equity and every idea of justice to release a security for more than he is injured by the release of the mortgage granted by the vendor to the vendee for whose benefit the security may have signed.

Reason teaches that the security should be released only for the amount of injury that he has sustained. It is true that the act of mortgage bears upon every part of the property, and each part of the property is subject to the mortgage, but each part is only worth a certain amount, and when the mortgage on that part is released, the security is only injured to that amount. If it should be argued that the mortgage is one and indivisible, and the release of a part is equal to the release of the whole, because the whole amount of the mortgage bears on every part, then it follows that a partial release is no release at all, for if a peace of property is mortgaged for $50,000 and the release is for $10,000, then if the mortgage is one and indivisible, the release of $10,000 amounts to nothing.

The release must be for the whole amount or it avails nothing. If then such a theory is adopted, *Barrow's* release of mortgage must be considered as amounting to nothing or as never having been made, and the endorsers of *Thos. R. Shields* could still have enforced their mortgage on *Primus* and *Joe*.

I conclude then, that the release of the mortgage on these slaves, merely released the securities for their value, or else that they have never been released at all, on account of the impossibility of executing a partial release. If the latter view is adopted, then the objection of defendants is deprived of all force. If the former, then the securities were released only for the value of the slaves on which the mortgage wes raised.

But there is authority to show that the securities are only released *pro tanto*.

The case of *John B. Hereford* v. *W. H. Chase*, 1st Rob. Rep., has been quoted by the defence as sustaining the doctrine, that the release of mortgage on a part of the property cancels the liability of the security for the whole amount; but an examination of this case shows that it cannot be considered as a decision clearly in favor of that principle.

In that case the plaintiff sold to one *Desmont* ten slaves for $6,750, and received the note sued on, which was endorsed by defendant, *Chase*, and bore ten per cent. interest from its date. On the 11th March, 1839, the plaintiff repurchased of Desmont nine of the same slaves with the addition of a child born after the sale, for $4,675, and it did not appear whether the *tenth* slave *died* or remained in the possession of the vendee, nor was the *relative value* of the *slaves* shown, and notwithstanding this state of facts, the endorser had judgment against him in the Commercial Court for $3,458 50. Now, under this state of facts, the judgment of the Supreme Court reversing said judgment was certainly correct, because there was no *relative value* shown of the slaves sold, and the one which may have remained, and all the slaves were sold but one, and nothing was shown as to that slave, whether he was living or dead, and the mortgage was removed from all the slaves except one, and yet there was judgment against the endorser for $3,458 50.

Now by this state of facts the right of subrogation was taken from the security, because it was not shown what was the value of the slave that remained; but the present suit is very different; more than half of the price of the plantation and slaves by the sale of 27th July, 1836, had been paid previous to the compromise of November 9th, 1842; the plantation and negroes still remained with the exception of any of the slaves who may have died and of *Charles*, *Primus* and *Joe Ogden*.

The value of these three slaves is shown by the sales. *Primus* and *Joe Ogden* could only have injured the plantations, and the recourse of the securities, as they were runaways and set a bad example to the other slaves, and they were sold for 1,050. As to *Charles*, in case the mortgage on him could be considered as raised by the promise of *Barrow* to raise it, he was when sold aged three years, and at the time of the compromise he was not quite six years old. *Thos. R. Shields* sold him for one hundred and fifty dollars.

The rights of the security thus at the utmost were valued $1,150, and if the mortgage on *Charles* is not deemed to have been raised by *Barrow*, then the rights of the securities cannot be considered as having been injured at all by the raising of the mortgage on the runaways *Primus* and *Joe*. The situation then of the endorsers to the sale of 27th July, 1836, by the release of this mortgage on *Primus* and *Joe*, at the time of the compromise, was

BARROW
v.
SHIELDS

very different from that of the defendant, *Chase*, in the said suit of *Hereford* v. *Chase*.

In the latter case, the Supreme Court no doubt thought that there was a fraudulent combination between the plaintiff and the principal debtor to make the surety lose, and fraud tainting the whole transaction, the Supreme Court very properly released the defendant from the whole claim.

The principle is well stated by C. J. Eustis in *Saulet* v. *Trépagnier*, 2 An., p. 429; he says: "It would seem to be a necessary consequence of the principles of the law of suretyship, that the surety is entitled to the whole benefit of all the sureties in the hands of the creditor; and if any of them be lost by his willful neglect or want of due diligence, the surety is *to that extent discharged.*" Judge Eustis refers in that decision to various authorities, and among others, to Theobald on principal and surety, in which the following passage occurs (Law Library, vol. 1, p. 153, §274). After stating the facts, Lord Loughborough said: "If the plaintiff might have recovered the whole, this action might, on equitable grounds, be entirely stopped, if only a part, equity would relieve *pro tanto.* And page 87, §176, it is said that in *Capel* v. *Butler*, the Vice-Chancellor was of opinion that the plaintiff, as security, was entitled to take advantage of the proviso for redemption, and that as the value of the vessels had been lost to him by the neglect of the defendant, *Butler*, he was entitled to deduct it from the stipulated price of redemption.

The case of *Gosserand* v. *Lacour* (8 An., p. 75) is based on the same spirit and considerations. In that case, a debt was secured by two joint and several securities. Either of them might have been sued for and compelled to pay the whole debt, and if one of them had paid it, he might have recovered one half of it from his co-surety. The creditor *gave time to one of the sureties*, and sued the other for the whole. It was held that, by this giving time, he had discharged the defendant of one-half of the responsibility and could recover from him only the other half, and for this amount the plaintiff had judgment.

The French authors also show that releases of mortgages only discharge the endorsers to the extent of the injury which such releases would cause by impairing their right of subrogation to all the securities in the hands of the creditors. Dalloz, Juris. du XIX siècle, vol. 4, p. 5, v. Caution:

"Encore que par son fait le créancier se soit mis hors d'Etat de pouvoir subroger la caution à tous ses droits et privilèges contre le débiteur principal, il ne s'en suit pas que la caution doive être libérée par le tout; elle n'est déchargée vue jusqu'à la concurrence du préjudice qu'elle éprouve par l'impossibilité de la subrogation. *Bouteille c. Reveillac.*

The Court, in giving its opinion in the above case, refers particularly to Arts. 2024 and 2037 of the French Code, which are almost word for word Arts. 3017 and 3030 of our Code. Dictionnaire du Droit Civil Moderne, vo. "Cautionnement" No. 161. "Remarquez au surplus, que bien que par son fait le créancier se soit mis hors d'état de subroger la caution à tous ses droits contre le débiteur principal, il ne s'en suit pas qu'elle doive être libérée pour le tout; elle n'est déchargée que jusqu'à la concurrence du préjudice qu'elle éprouve par l'impossibilité de la subrogation." Vide also Troplong, No. 572, Ponsot, No. 334, Repertoire du Journal du Palais, Cautionnement, No. 326. Gilbert, Codes Annotés—note 15 to Article 2037, &c., &c.

The courts in the other States also hold the same doctrine.—A creditor who releases any security which he holds for the payment of his debt thereby

releases a surety *pro tanto*. *Neff's* appeal, 9 Watts and Serv, 36 (Penn.); U. S. Digest, vol. 5, Surety, No. 160. See also 162, and vol. 6, Surety, No. 42. It appears then that the English and French authorities, and also the decisions of the Supreme Court of Louisiana, sustain the doctrine that the endorser is only released for the amount of injury he has sustained by the action or neglect of the creditor, by which he is prevented from being subrogated to the rights against the principal debtor—and this view accords with reason and common sense. The endorsers of *Thomas R. Shields* were then only released for the value of the negroes on which *Barrow* raised the mortgage.

Now let us suppose that this release had been known to the endorsers, would that have prevented them from entering into the compromise of Nov. 9th, 1842?

The defence is that the defendants were in error when they entered into the contract of 1842. Art. 1817, C. C., says, that it is only an error in some point which was a principal cause for entering into a contract, which can invalidate it. Now, in this case, it appears that at the time this act of Nov. 9th, 1842, was passed, the defendant or their ancestors were endorsers on notes still unpaid on the price of the sale of 1836, to the amount of one hundred and nineteen thousand, nine hundred and fifty-six dollars and thirty-five cents. The whole of this amount was then actually due, except the sum of $26,000 due 4th March, 1843, and $26,000 due 4th March, 1844. Owing to the depreciation in the value of property, and so large an amount being due, *Barrow* might have got the property and still held the securities liable for a much larger amount than the $32,000 due by them by the act of Nov. 9th, 1842; he might also have got an immediate judgment against the defendants and harassed them much and put them to a great deal of expense.

Their principal object was to obtain time for themselves—to extricate their friend, *Thomas R. Shields*, and to relieve him and *Bisland* who was endorser on *all* the notes, from the ruinous effect of an execution at that disastrous period.

It cannot be presumed that in the execution of the contract of 1842, which they pressed upon the plaintiff, they would have been arrested by the thought that they might possibly have diminished their responsiblity by $1050, (the price of *Primus* and *Joe Ogden* in the sale from *Thomas R. Shields* to *Jacobs*). Were these $1050 the principal object of the contract?"

Toullier, vol. 6, p. 69, par. 68, says:

"Mais s'il n'était pas prouvé que l'erreur de droit était la cause principale du contrat, par exemple, s'il pouvait avoir pour motif de satisfaire une obligation imparfaite, ou un devoir naturel, il ne pourrait être annulé, parce qu'alors il deviendrait impossible qu'il n'ait d'autre fondement qu'une erreur de droit. Ibid, p. 71, par. 70 and 71; vide also 18 Duranton, No. 423."

Another motive for making this compromise of Nov. 9th, 1842, was that *Barrow* had already instituted a suit against *Thomas R. Shields* and *Bisland*, which *Barrow* by that act bound himself to dismiss, and *Barrow* had also instituted another suit against *Bisland* in New Orleans, the prosecution of which was enjoined by *Bisland's* cross-bill.

The principal motives for entering into the contract of Nov. 9th, 1842, would not then have been affected, if the endorsers had known the releases, and they would have made the compromise of 1842; for if they had refused the compromise on account of the release of mortgages, they might have had $1050 de-

ducted, but they still would have been immediately liable for large amounts. *Thomas R. Shields* would have lost his plantation, and they would have been obliged finally to pay more than the $32,000.

We conclude then, that the endorsers knew of the release of the mortgage, but if they did not, they would have been released only *pro tanto*, and as they would still have entered into the contract of Nov. 9th, 1842, even if they had known of their partial release, such release of the mortgage cannot invalidate the act of Nov. 9th, 1842.

The defendants also plead that the notes sued on are prescribed, and plead the prescription of five and ten years; but an examination of the evidence establishes that this plea cannot be sustained. The C. C., Art. 3483, says: "There are two modes of interrupting prescription, that is by a natural interruption or by a legal interruption." Art. 3484, C. C., says: " A legal interruption takes place when the possessor has been cited to appear before a court of justice on account, either of the property or of the possession; and the prescription is interrupted by such demand, whether the suit has been brought before *a court of competent jurisdiction or not*," and Art. 3516 C. C., says " The prescription releasing debts is interrupted by all such causes as interrupt the prescription by which property is acquired, and which have been explained in the first section of this chapter."

It is a reasonable deduction from the preceding Articles, that a legal interruption takes place when a debtor voluntarily appears to contest the right of action on the demand of a creditor."

We consider that the defendants have all been cited to appear in the manner contemplated by these Articles, and shall proceed to show the same by reference to the pleadings on the suit originally instituted by the present plaintiff for the purpose of rescinding the contract of Nov. 9th, 1842, and by reference to the pleadings on the "cross-bill in equity," filed March 4th, 1843, by *Wm. Bisland* of the State of Mississippi. But before doing so, we will mention the principal points made in the argument of the defendants to show that a legal interruption to prescription was not effected by the Chancery proceedings.

Now it has been alleged by counsel of defendants in the argument, that prescription is only avoided by suits when the demand is clearly set forth in the petition. That at the time of filing amended bill, by *Barrow* on the 10th Feb., 1844, one-half only of the notes given under the act of Nov. 9th, 1842, were due, to wit: those due in March, 1843, and that prescription could not be arrested by a bill in Chancery suing for notes not due, and that there is no prayer for judgment on the second series of notes, falling due in March, 1844, that prayer for the specific performance of any thing is not the same as asking for payment; that there is no description of any notes endorsed by *Shields* in the original or amended bill; that there was no suit pending for the notes that *William Shields* executed, but only for those he endorsed; that.if the prayer as to *William Bisland* and *Mrs. V. Shields*, which counsel for defendants alleges is rather more full than as to the rest, is sufficient, then they are bound only for one-half of the notes, for the other half were not due when suit was commenced; as to *William Shields*, that there is no prayer asking judgment on the notes against him, therefore he is not bound at all, and as to *Guion, Winder* and *Ellis*, they were never made parties, and prescription has accrued without legal interruption.

We will show, by an examination of the pleadings, that none of these ob-

jections are valid, or have a foundation in fact; that there was a full description of the notes now sued for ; that judgment was prayed for the execution of the act of Nov. 9th, 1842, and for the payment of all the notes now sued for, the second as well as the first series, and that all the defendants were parties to the suit in the United States Court, and here we would remark that it is necessary to keep distinctly in the mind the two stages in the suit in Chancery— the first was the bill for the rescission of the compromise of Nov. 9th, 1842, and the answers thereto, and the second was the order of the court on 24th April, 1844, ordering defendants to file a cross-bill praying for a specific performance of the contract, and to make all parties residing in Louisiana defendants thereto ; otherwise, that *Barrow* should be at liberty to proceed on his bill for the specific execution of the original contract, and for a rescission of the compromise of 9th Nov. 1842. The defendants alluded to, in said order of court, are *Mrs. Victoria Shields* and *William Bisland*, who were the only defendants to the original bill of complaint, filed 19th December, 1842.

Let us now proceed to an examination of the pleadings in the Chancery proceedings and we will perceive the invalidity of the defence of defendants to this present suit.

On the 19th December, 1842, *Barrow* filed a bill in equity in the Circuit Court of the United States, Fifth Circuit and Eastern District of Louisiana, against *Mrs. Victoria Shields* and *William Bisland*, the only parties to the act of Nov. 9th, 1842, who were not citizens of Louisiana, praying for the rescission of the act upon a number of grounds, therein detailed at length.

In this bill the act of Nov. 9th was explained; in it, *Barrow* mentions the stipulation in said act between himself of the first part, *Thomas R. Shields* of the second part, and *Mrs. Victoria Shields, William B. Shields, William Bisland, George S. Guion, Richard G. Ellis* and *Van P. Winder*, his endorsers of the third part; as to the cancelling the sale of July 27th, 1836, as to his objections, and the bill alleges that in consideration thereof, " the said six endorsers should execute each two promissory notes of equal amount, one of them payable in March next, (1843,) the other in March, 1844, which notes were given by them in different sums, and made together the sum of thirty-two thousand dollars ; that said notes were deposited in the hands of the parish Judge of Terrebonne, to be delivered to your orator as soon as he should have reacquired a title to said property, and should have released said endorsers from all further responsibility. And it was further agreed that a negro woman, *Liza*, who had been obtained by said *Thomas R. Shields* in exchange for a negro man whom he had purchased from your orator, should be given to your orator, and that said parties of the second part and third part, should pay all expenses of said plantations for the current year up to the time of said contract."

As the object of this bill was to rescind the act of Nov. 9th, 1842, and not to enforce payment of the notes given under it, it was not then necessary to specify the amount of each note given by the endorsers under the provisions of said act, but the names of the makers of each note now sued on are given, that each executed two notes, and the time when payable is also alleged, and the total amount, and reference is given to the office where said act was passed.

On the 4th March, 1843, *Mrs. Victoria Shields* and *William Bisland* each filed their separate answers, and they both aver that a compromise was made

before *Judge Barras* on the 9th Nov. 1842, that they never had any idea of receding from it, and that they did furnish their notes, each for the respective amount by which said contract was to be paid, and did procure said notes to be well endorsed to the satisfaction of said *Barrow*, and deposited according to said agreement in the hands of the parish Judge of Terrebonne, to be delivered over to said complainant, as soon as he should deliver up to said *Shields* the notes which he held remaining unpaid, with the endorsements, to be cancelled and annulled.

It is clear from the original bill and answers of *Mrs. Victoria Shields* and *William Bisland*, they were aware of the amount of the notes executed by them and endorsed by others, for they expressly alleged, they executed their notes and had them endorsed for the respective amounts called for by the act of Nov. 9th, 1842.

On the same day that the answers were filed, to wit: on the 4th March, 1843. *William Bisland* filed a cross-bill praying for a specific performance of the act of Nov. 9th, 1842, for an injunction to restrain *Barrow* from proceeding in the suits which he had instituted against him in the First District Court in New Orleans, (this allegation was erroneous, the suit was in the Commercial Court of New Orleans,) and in Terrebonne on the unpaid notes given for the plantations on the 27th July, 1836, and for an order compelling the delivery of these notes as agreed upon in the act of Nov. 9th, 1842. The injunction was granted, the suits discontinued, and the notes ordered to be deposited in the court.

Let us now consider briefly the object of the cross-bill and come to its allegations.

In it *Bisland* avers the validity of the act of Nov. 9th, 1842, he fully sets it forth and asks to have it specially enforced, he " being ready and willing and hereby offering specially to perform the said agreement in all things on his part and behalf."

He further alleges, that notwithstanding said act of Nov. 9th, that *Barrow* has not discontinued two suits, and an attachment suit commenced before the act of Nov. 9th, on the notes endorsed by *Bisland* at the sale of the 27th July, 1836.

*Bisland* asks for an injunction to keep *Barrow* from proceeding against him on any of said notes of July 27th, 1836, and that he may be restrained from negotiating them, and he reserves the right hereafter to proceed at law against *Barrow*, to recover the damages sustained by him, *up to the time that the said agreement shall be specially performed* by said *Barrow*, and he prays for general relief and for a citation against *Barrow*, &c., &c.

In said cross-bill the names and responsibilities of the defendants on their notes were given in the following words: " The consideration of said contract, as therein expressed, was the sum of thirty-two thousand dollars, which your orator and the other endorsers obligated themselves to pay to the said *Barrow*, in the following manner and in the following proportions, to wit: your orator was to pay ten thousand dollars in two equal instalments, the first in March, the next and other in March following, for which sum your orator made his two promissory notes, endorsed by *John P. Watson*, and payable at the office of the Louisiana Bank in New Orleans. The said *R. G. Ellis* was to pay six thousand nine hundred and sixty-six dollars and sixty-six cents in two notes endorsed by your orator; the said *George S. Guion* was to pay two thousand

seven hundred and fifty dollars in two notes endorsed by *Van P. Winder*; the said *Van P. Winder* two thousand seven hundred and fifty dollars in two notes endorsed by the said *George S. Guion*; the said *William R. Shields*, four thousand seven hundred and sixty-six dollars and sixty-six cents, in two notes endorsed by *Mrs. Victoria Shields*; and the said *Mrs. Victoria Shields* the same amount as the last mentioned, in two notes, all of which notes to be payable at the Louisiana Bank in New Orleans, and the aforesaid notes as expressed in said agreement were all duly executed as agreed, and were deposited in the office of the said parish Judge, to be by him delivered unto the said *Barrow*, as soon as he should have acquired a title to the property aforesaid, and should have given up the aforesaid notes, &c., &c."

Now in said cross-bill *Bisland* states the amount of his obligation by act of Nov. 9th, and that he is ready to fulfill his part of said contract, and gives the names of the other parties and the amounts of their respective obligations, and reference is made to the act of Nov. 9th, 1842.

On the 10th of February, 1844, *Barrow* filed his petition declaring his willingness to abide by the contract of Nov. 9th, and praying to be allowed to make *Thomas R. Shields* a party to the act, to which the court assented.

In this petition *Barrow* prays that "if the court should be of opinion that the said agreement of November 9th is valid and should not be set aside, then he prays a specific performance may be decreed according to its true purport and tenor." And he prays that the defendants may be ordered to pay "him the amount *of the notes that may have been drawn by them*, and also such of said notes *as may be endorsed by them.*"

On the 10th of February, 1844, *Barrow* filed an answer to the cross-bill of *Bisland*, repeating his willingness to abide by the contract of 9th November, 1842, and reciting the discontinuance of the suits against *Shields* and *Bisland* and the deposit of the notes in court according to the order of court. In this answer he avers that if the other parties of said agreement will execute the act of Nov. 9th, he will do the same, and avers also that said *Bisland* and *Mrs. Shields* have filed their answers, averring that they and the other parties to the act aforesaid were willing to comply with the same, he also avers that *Bisland* is indebted to him on certain of the first series of notes, *and if the second are not paid*, that he will be indebted to him in the *further sum* of $8483 33 with costs of protest and 5 per cent. interest from 3d April, 1844, for which sums he is entitled to judgment. *Barrow* also mentions specially the amount of the notes of the first series which are due. On the same day, 10th February, 1844, he filed his petition repeating the above facts and praying that the notes under the act of Nov. 9th, 1842, should be delivered by *L. Barras* to the Clerk of the court, who should deposit them in bank for collection. He represents, that although *he reserves for the present* his claim to the possession of said notes, still it is necessary for his rights to have the second series put in bank for collection, and if not paid, protested; he prays, if said notes are paid that the proceeds may be *held* subject to the order of court, and that if not paid, the Clerk may withdraw them after protest and *keep them in his possession* until *the further order of court.*"

This order was granted and the notes deposited in court by the Clerk who had received them from *Judge Barras.* Subsequently, on the 24th April, 1844, the court ordered that unless the defendants filed a cross-bill, praying for a specific execution of the contract of Nov. 9th, 1842, and making all parties

thereto residing in Louisiana defendants thereto, *Barrow* should be at liberty to proceed upon his bill of complaint for a specific execution of the original contract and a rescission of the second.

This order changed the whole nature and object of the suit. In obedience to it, *William Bisland* and *William Shields* filed their cross-bills to this effect on the 8th of July, 1844.

In said cross-bill, speaking of the act of Nov. 9th, 1842, they say : "The consideration of the said contract was the sum of thirty two thousand dollars, which the parties of the third part obligated themselves to pay to the said *Barrow* in the following manner and in the following proportions, viz : "

" Your orator, *William Bisland,* was to pay ten thousand dollars in two equal installments ; the first in March, 1843, and the other in March following, for which sum your orator made his two promissory notes endorsed by *John P. Watson,* and payable at the office of the Louisiana Bank in New Orleans; the said *R. G. Ellis,* $6,966 16, in two notes endorsed by your orator, *William Bisland ;* the said *George S. Guion,* $2,750 in two notes endorsed by *Van P. Winder* ; the said *Van P. Winder,* $2,750 in two notes endorsed by *George S. Guion ;* the said *William B. Shields,* $4,766 66, in two notes endorsed by *Mrs. Victoria Shields ;* and your oratrix, *Victoria Shields,* the same amount in two notes payable as aforesaid at the office of the Louisiana Bank in New Orleans, which notes were deposited in the office of the parish Judge of Terrebonne, to be by the said Judge delivered unto the said *R. R. Barrow,* as soon as he should have acquired a title to the aforesaid property, &c., &c." They also pray that *R. G. Ellis, Van P. Winder, W. B. Shields, T. R. Shields, Guion* and *Barrow,* may answer the premises, and that the aforesaid agreement of 9th of November, 1842, may be specially performed, &c., &c.—and pray they may be cited to answer the premises and abide such order and decree herein as shall be agreeable to equity and good conscience.

It is clear, in said cross-bill, the whole amounts owned by defendants are set forth distinctly, as well that due as endorsers, as that due by them as makers, and the prayer is that they may be ordered to execute the contract specially, which would be the delivery of the notes to *Barrow,* the payment of them and the execution of the other obligations they had incurred by the act of November 9th, 1842.

The parties thus brought in answer as follows : *Ellis, Winder* and *Guion,* first filed a plea to the jurisdiction of the court, which was overruled, and on the 1st of September, 1845, *Winder* and *Guion* filed their answers, averring, among other pleas, that they could not pay the notes of November 9th, 1843, while *Barrow* sought to annul it. That *Barrow* having refused to comply with the act of 1842, he must be considered as holding the plantation as a trustee, " and your respondents pray that said complainant do render a strict and full account thereof and of said management, and that if the other grounds of defense above set forth be deemed insufficient by this court, that then the amount of revenues received by said complainant, or the amount which he might with proper management have received, be *imputed* by this court to the payment and discharge of all your respondents' liabilities under said act of 9th November, 1842, and the notes given in pursuance thereof.

Now, in this answer they pray to be discharged from the payment of the notes before fully described, and of which they show they have full knowledge ; and if they cannot be discharged, that the revenues received by *Barrow* from

the plantation, might be imputed to their payment. We would here remark, that *Ellis*, in the mean time, had died, and on the 6th of April, 1846, *Bisland* and *Mrs. Shields* filed a bill of revivor against *R. E. Butler*, his testamentary executor, and *Mary Jane Towsen*, natural tutrix of his children, and on the 4th February, 1852, they filed their answer similar to that of *Guion* and *Winder*. *Mrs. Shields* and *William Bisland* filed their plea to the jurisdiction, which was overruled, and then filed their answer. In the mean time *Bisland* died, and his heirs were made parties by a bill of revivor filed 30th October, 1847. *William B. Shields* filed his plea to the jurisdiction, stating that he was a citizen of Mississippi, when the subpœna was served on him—on 5th March, 1847. *Barrow* filed a petition to make *William Shields* a defendant, and prays, among other things, that he may be cited and "may be ordered to answer the aforesaid bill filed on the 19th December, 1842, and the aforesaid amended bill filed on the 10th of February, 1844, that he may be condemned to pay the notes in principal and interest which are endorsed by him and which are now described in said bills, and that your orator may have against said *W. B. Shields*, such other and further relief in the premises as was heretofore prayed for in said bills, and as the nature and circumstances of this case may require."

In this petition, then, *Barrow* not only asks for judgment against *William B. Shields* on the notes he had endorsed, but also for judgment against him for all that was asked for in the other two bills. On the 5th of April next, *W. B. Shields* sets forth the sale of 1836, and compromise of 9th November, 1842 ; he avers, that "in pursuance of this contract, respondent executed and placed in the hands of the parish Judge, according to agreement, two notes for $2,383 33, as drawer, and endorsed the other notes of same amount drawn by *Mrs. Shields*, the same being notes now in court, and to which reference is hereby had." He sets up the release of the mortgage and his freedom thereby from liability on said notes, and he "denies all and singular the claims and pretensions set up by complainant against this respondent."

On the 15th of December, 1852, judgment was rendered, condemning the parties to pay their notes under the agreement of November 9th, 1842.

On appeal, the case was dismissed by the Supreme Court of the United States.

It thus appears that all the parties were cited to appear before a court on account of the claim, to which prescription would attach, which created a legal interruption of prescription. C. C., Arts. 3484 and 3516. Prescription being once interrupted, the previous time can never afterwards be computed to make up the time necessary to prescribe, which recommences only from the cessation of the interruption. Hen. Digest, p. 1283, sec. 1. This cessation took place in 1855, when the suit was dismissed by the Supreme Court of the United States. On this point, see also *Driggs* v. *Morgan*, 10 R. 119.

It has been decided in 15 La. 491, that a citation and suit in a federal court, whether in this State or in another State interrupts prescription. In conclusion, we would remark, that as long as the suit in chancery was to rescind the act of 9th November, 1842, and to enforce the contract of 1836, no suits could be brought upon the notes of 9th November, 1842, and, therefore, the time that elapsed from the commencement of the suit for rescission up to the time that this action was changed into one for the enforcement of the contract of 1842, cannot be counted to make up prescription, and then from the time that

the suit was to enforce the contract of 9th November, 1842, prescription could not run, because the notes were in possession of the court, who was adjudicating on the rights and responsibilities of the various parties thereto. It was not possible to commence any suit upon them in any other court, for the United States Court held possession of them and claimed the power of rescinding the compromise of 9th of November, 1842, or of enforcing it, and until they had finally decided thereupon, no other could act, for it would have no notes on which to render judgment. As it was then impossible for plaintiff to sue on said notes as long as the Chancery Court held them, prescription cannot begin to run against them until the final decision at Washington in 1855.

These remarks apply not only to the first, but also to the second series of notes—the latter were ordered also to be brought in court, and held subject to the order of the court, and finally judgment was rendered on them as well as on the first series. It is also clear that all the defendants or their ancestors were parties to the suit in chancery—their ancestors show a perfect knowledge of their liabilities under the act of November 9th, 1842, and it is in vain to say that they were not cited and did not know what they were sued for, and that there is no prayer against them, when their answers proved that they perfectly understood the claim of *Barrow*, and asked to be relieved therefrom. Besides, as *Bisland* asked for the execution of the contract of 9th November, 1842, it could not be done unless it was executed by all the other parties to it, so that the prayer was good as to them when they should be made parties.

Again, as long as it was undecided by the court whether the act of 1842 should be executed or not, prescription could not begin to run. By that act some duties were incumbent on *Barrow*, and some on the endorsers, before the notes could be delivered up by Judge *Barras*, and, consequently, before a suit could be brought upon them, and several of the questions before the Chancery Court, were as to the various liabilities of the respective parties to this compromise, and the judgment of the court is not only for the payment of the notes, but also for other claims of *Barrow* under the act of November 9th; among others, the transfer and retrocession of the property intended to be reconveyed to him by said act of November 9th, 1842, said transfer to be approved by a master of the court.

And by said judgment, the endorsers were condemned to pay certain priviledged debts of *Thomas R. Shields*, which *Barrow* had been forced to pay, and which, by said act of November 9th, 1842, they had assumed to pay.

Now, *Bisland* in his cross-bill sought to enforce the contract of 9th November, 1842, and all the liabilities of the parties to it had to be investigated, before the court could order the notes given under said act, to be delivered up to *Barrow*, or before it could give judgment thereon. Besides *Barrow* could not institute another suit for payment of the notes, because defendants, in their answers to *Bisland's* cross-bill, denied their liability on the notes, and asked to be discharged—how could *Barrow* bring a new suit for payment of these notes, when the LIABILITY of the defendants on these notes was directly put at ISSUE by themselves, and when they prayed to be released entirely from their payment.

Burge on Suretyship, p. 274, says: "It is a general maxim that prescription does not run against a person who is not entitled or not enabled to sue for his demand: "contra non valentem agere non currit prescriptio."

It cannot run, therefore, where a debt is payable on a condition, or on a future day, until the condition takes effect, or the day for payment has arrived.

And I would here remark, that all the pleas in the present defence, and more also, were urged by defendants in their appearance in the Chancery Court, in their defence against the payment of the notes now sued on; how can they say they never were cited, when the whole record of the chancery proceedings establishes the contrary? And even supposing they were not cited, they appeared in court, filed their answers and clearly set forth what they were defending themselves against.

If a party appears in court and contests the right of a plaintiff, and thereby it becomes impossible for the plaintiff to institute other proceedings; after contesting those rights for years, when finally the Supreme Court throw the whole proceedings out of court, and plaintiff begins his suit again in another tribunal, can defendants with any reason or justice allege they never were cited in the original proceedings and that prescription attaches to their obligations? No, I think it is impossible to sustain such a plea under such circumstances; the plaintiff in the present suit and the defendants are in such circumstances, and the plea of prescription cannot be effectually made.

If it be said the Chancery Court had not the legal right to order *Bisland* to make the part of the defendants, who resided in Louisiana, parties to the suit, I answer, that this right was exercised, and the defendants were placed in no worse position, than is always the case when persons are sued in courts that have no jurisdiction over them, and the Civil Code asserts positively that the prescription is interrupted whether the suit is brought in a competent court or not.

It is also urged that the Supreme Court of the United States, in their judgment avers, that the defendants were not parties to the suit in chancery, and if not parties, then defendants allege prescription was arrested. This, however, is not the meaning of the court. The judgment avers, that when the defendants, *Mrs. Shields* and *Bisland* had complied with the order of court, and filed their cross-bill against the other endorsers and *Thomas R. Shields*, they came into court, but that in truth, " they were not parties to the original bill, they were only defendants to the cross-bill. They had no right to answer the original bill or make defence against it, and of course no decree could be made against them on that bill."

The Supreme Court do not intend to assert that the defendants were not all in court. On the contrary, they aver that they were, but that the court have no *lawful* jurisdiction over the parties under the pleadings—and that the court never had *lawfully* before it such parties as were indispensable to a decree for a specific performance of the contract. Now, Art. 3484 C. C. says, that prescription is interrupted, whether it is brought before a competent *court or not*.

It is admitted in the judgment of the Supreme Court that the defendants came into court, but that the United States Court had no lawful jurisdiction. This then is a case provided for in said Art. 3484, and, therefore, as the suit was only dismissed in the year 1855, prescription has not accrued.

As to the objection made that the demand for the first series of notes could not be made, and consequently they could not be legally protested because defendants were prevented from paying them by the suit to rescind the com-

BARROW
*v.*
SHIELDS.

promise of 1842, I would remark that the protest was necessary as a *conservative* measure to protect the rights of *Barrow*. If the endorsers were willing to pay without protest and to abide by the compromise of 9th November, 1842, they could have deposited the amount of the notes in court, or some other lawful place.

These remarks apply as well to the second as to the first series of notes.

For the reasons above set forth, and the premises considered, judgment must be written up for plaintiff.