Plaintiff alleged that she was injured when her coupe automobile, in which she was riding, then being operated by one J. C. Pruitt, was driven into a ditch at the intersection of Hollywood Avenue and the Mansfield concrete highway, south of the City of Shreveport, Louisiana, in Caddo Parish. She sues for several elements of damages. The Standard Oil Company of New Jersey is made defendant.
Plaintiff, with her invalid husband, lives in the Village of Mooringsport, twenty miles north of Shreveport, and for some time they have had the services of Mrs. Ida Hurn, a practical nurse. In the morning of the day of the accident, plaintiff and Mrs. Hurn desired to visit the City of Shreveport on business. Mr. Pruitt, a family friend, who had been driving the coupe on missions for them, was requested to operate it on the trip and consented. That afternoon, at about the hour of five o'clock, Pruitt picked up Mrs. Hurn and they then drove to the home in the southern part of Shreveport where plaintiff informed them she would be at that time. She got into the coupe and sat nearest the right door. The party proceeded westerly on Hollywood Avenue to the Mansfield highway where it was their intention to turn north and proceed northerly to Mooringsport.
East of the intersection, and a very short distance therefrom, the avenue crosses at right angle two tracks of the Texas and New Orleans Railroad Company. Prior to driving over the west track Pruitt stopped the coupe to determine if it was safe to proceed forward to the highway. Seeing no trains approaching from either direction, he drove forward at a moderate rate of speed. When he had nearly cleared the most westerly track he pulled the coupe rather sharply to his right. The right front wheel dropped into a deep ditch at the north end of a grass covered culvert that forms a link in the draining ditch that parallels the west track, and the car stalled. It did not turn over, but the descent of its right end was so sudden that the weight of Pruitt and Mrs. Hurn, to some extent, fell upon plaintiff and pressed her somewhat violently against the door. The right rear wheel of the coupe hung against the west rail of the track. Pruitt and Mrs. Hurn say they left the coupe by way of the left door and then assisted plaintiff therefrom. They escorted her to a filling station across the highway where she was provided with a chair. Pruitt and several men returned to the stalled car and tried to extricate it from the ditch, but failed in the effort. After a lapse of some fifteen minutes it was struck and destroyed by a southbound freight train.
The gravamen of the suit lies in the charge that the coupe was forced into the ditch by a truck and trailer of the defendant, which encroached upon the coupe's side of the avenue, as they made a left turn from the highway into the avenue. On this score a charge of negligence is made against defendant's driver.
Defendant filed a plea of prescription against the suit and exceptions of no cause *Page 541 
and no right of action, all of which were overruled. The court gave written reasons for overruling the plea. All are urged here.
Briefly defendant's answer denies that the movement and course of its truck made it necessary for the driver of the coupe to execute the sharp turn to the right that landed it in the ditch. It avers that the turn was made voluntarily and in furtherance of Pruitt's desire to quickly get upon the highway and head toward his destination; and had he been maintaining a proper lookout he would have averted the accident.
Defendant specially denies that plaintiff sustained any injuries from the coupe being stalled, but alleges if she did so, same are attributable to the negligence of her own agent and driver in that he did not maintain a proper lookout and heedlessly drove his vehicle into the ditch as aforesaid; that she had the power to and was exercising control and direction over said driver; that, therefore, in law, his negligence was her negligence. Contributory negligence on the part of Pruitt, in the alternative, is specially pleaded.
Plaintiff's demand was rejected and she appealed to this court.
 Plea of Prescription
The accident occurred October 7, 1946. On October 6, 1947, only one day less than one year following the accident, plaintiff filed suit in the District Court of Caddo Parish against the Standard Oil Company and the Texas and New Orleans Railroad Company on the cause of action herein alleged upon. This suit was on January 12, 1948, dismissed on exceptions of misjoinder of parties. No appeal was prosecuted from the court's action. The present suit was filed May 18, 1948, which was more than one year after the accident but less than one year subsequent to the dismissal of the first suit.
In support of the plea, defendant's assiduous counsel argues that the filing of the first suit only suspended the running of prescription from the date of its filing and while pending; and that when dismissed, defendant had only one day in which to renew it. Plaintiff contends that the first suit interrupted the course of prescription; that the interruption continued to the time of its dismissal, and from that date the cause of action became subject to the prescription of one year; or, in other words, prescription ran de novo.
Investigation of the question tendered has led to the conclusion that the issue turns upon whether the limitation of the time to file suit is one of prescription or peremption; if the former, the plea should be overruled; if the latter, it should be sustained.
The limitation of one year fixed by Article 2315 of the Civil Code, in which the named beneficiaries therein shall institute action, is one of peremption. It is tolled by timely filing of suit. The article clearly says that the action shall "survive in case of death * * * for the space of one year from the death".
The action may not be renewed after one year from date it arose, whether or not decided on its merits. See Matthews v. Kansas City Southern Railway Company, 10 La. App. 382, 120 So. 907, and authorities therein cited.
The footnote, 13 T.L.R., page 39, having reference to the reinscription every five years of chattel mortgages, concerning the difference between the nature and effect of prescription and peremption, says:
"A period of peremption admits of no interruptions or suspensions. The performance of the required act must be accomplished within the specified time at the peril of the party whose duty it is to perform such act. A period of prescription differs in that it may be suspended or interrupted for various reasons. The institution of suit interrupts prescription. La.Act 39 of 1932; McCoy v. Arkansas Natural Gas Co., 184 La. 101, 165 So. 632 (1936). But it does not affect peremption. McElrath v. Dupuy, 2 La. Ann. 520 (1847); Hyde v. Bennett, 2 La. App. 799 (1847); Murff v. Ratcliff, [19 La. App. 109, 138 So. 908], supra note 93."
And along the same line, the Supreme Court in Guillory et al. v. Avoyelles Railway *Page 542 
Company et al., 104 La. 11, 15, 28 So. 899, 901, stated:
"When a statute creates a right of action, and stipulates the delay within which that right is to be executed, the delay thus fixed is not, properly speaking, one of prescription, but it is one of peremption.
"Statutes of prescription simply bar the remedy. Statutes of peremption destroy the cause of action itself. That is to say, after the limit of time expires the cause of action no longer exists; it is lost. Taylor v. Cranberry, Iron Coal Co.,94 N.C. 525; Cooper v. Lyons, 77 Tenn. 596."
The foundation basis of the law of tort in this state is to be found in the first few lines of Article 2315 of the Civil Code, which reads:
"Every act whatever of man that causes damages to another, obliges him by whose fault it happened to repair it * * *".
The negligence charged to defendants' driver amounts to a quasi offense. Article 3536 of the Civil Code, in part, reads:
"The following actions are also prescribed by one year:
"* * * that for damages caused by animals, or resulting from offenses or quasi offenses."
It is not said, as in Article 2315 of the Civil Code, that the cause of action survives for only one year.
It is clear from this unambiguous language that the remedy to be employed to obtain satisfaction in the way of damages that arise from a quasi offense, must be availed of within one year from the date of the offense; that is, suit on the cause of action must be filed within that time. This was done in the present case and since the Code declares that the action shall be prescribed in one year from the date the "damages were sustained", it is evident that the legal rules applicable to prescription and not peremption apply. Filing of the suit interrupted prescription. Act No. 39 of 1932, Article 3518 of the Civil Code.
This brings us to the question; With respect to time, what was the effect of the interruption? We believe this question would be answered by lawyers and judges generally, offhand, by saying one year from the date the suit was dismissed by the court; and doubtless this accounts for the fact that this identical question has been but once passed upon by the Supreme Court. That was in the case of Riviere v. Spencer, 2 Mart., O.S., 79, in the year 1811. It was held in that case that from each interruption prescription will run de novo. However, the court was there dealing with a question of acquisitive prescription of ten years and it might with some force be argued that this decision should not be a precedent for the present case wherein the facts are entirely different.
The Court of Appeal, First Circuit, did have the same question before it in the case of Spring v. Barr, 9 La. App. 732, 120 So. 256, and followed Riviere v. Spencer. The lower court in the present case largely based its ruling on the plea of prescription upon this court of appeal case.
Defendant's counsel doubtless have made exhaustive search for cases wherein this important and interesting question was directly tendered, but they admit finding none save the two above cited. They did find several cases wherein loose statements by the courts appear that afford some comfort to them, but which are not decisive of the question. They cite and quote from: Driggs v. Morgan, 10 Rob. 119; Barrow v. Shields et al., 13 La. Ann. 57; Price v. Emerson, 16 La. Ann. 95; Talle et al. v. De Monasterio et al., 48 La. Ann. 1232, 20 So. 687; Wolf Sons v. New Orleans Tailor-Made Pants Company, Ltd., et al.,110 La. 427, 34 So. 590.
Also of same import is Turner, Wilson Company v. W. W. McMain et al., 29 La. Ann. 298.
These decisions are authority for the unchallenged principle that the filing of suit (since the passage of Act No. 39 of 1932) interrupts prescription with the concomitant that from the moment of interruption until the suit is finally disposed of, prescription is suspended. Beyond this we do not believe these cases go. And so it is in the present case. Since there is no decision nor statutory law to the contrary, so far as we are aware, or have been advised, we conclude, as did the lower court, *Page 543 
that when the suspension of the prescription ceased, contemporaneously therewith a new period of prescription for one year began. This result happens when a suit is instituted on a conventional obligation, accounts, etc., and we perceive of no sound reason why there should be a difference simply because the causes of action are different.
 Exceptions of No Right and No Cause of Action.
These exceptions are primarily predicated upon the proposition that damages are not recoverable for fright, shock, excitement, etc., incidents of an accident, when not accompanied by physical violence. The merits of these exceptions are to be determined from the allegations of the petition, as no testimony, in limine, was offered to support the exception of no right of action. When the coupe's wheel descended into the ditch, naturally this was accompanied by a jolt from the sudden happening. Pruitt and Mrs. Hurn were thrown against and to some extent upon the plaintiff. In Article 6 of the petition, it is alleged that she: "was shaken and jarred when said coupe went into the ditch, and before she could extricate herself from the car she heard someone say that a train was due and in the excitement caused by the accident and the fear of the approaching train, she hastened to get out of said coupe which was partly in the deep ditch and partly on the railroad track, and in so extricating herself she seriously hurt and strained her back and nervous system; and that by reason of the injury received in the accident and by reason of the excitement caused by said accident, she has received permanent injury and has suffered great pain."
In our opinion these allegations are adequate to remove the case from the rule upon which the exceptions are based. This ruling disposes of the secondary ground urged in behalf of the exceptions, to-wit: that whatever injury plaintiff sustained as a result of the accident, arose from the independent negligence of the railroad in running into and destroying the coupe.
There is direct conflict between plaintiff, Pruitt and Mrs. Hurn, on one side, and Holder, the truck driver, and Jack L. Barron, a young man riding with him at the time, on the other hand, with respect to the movements of the truck and trailer at the time of and immediately prior to the accident.
Pruitt testified that after stopping the coupe east of the railroad track, he moved slowly forward and as he drove upon the west track, the defendant's truck and trailer were coming down the Mansfield Road, "and he made a left turn on me", so fast that he (Pruitt) kept edging away from him and finally went into the ditch; that had he not pulled the coupe to its right there would have been a collision between the vehicles. Pruitt was not familiar with the locale. He did not remember whether or not he told the truck driver and young Barron immediately after the accident, as testified by them, that the position of the truck had nothing to do with the accident. He denied that he told the highway policeman, who arrived very soon after the accident, that there was clearance of ten feet between the vehicles when they passed. Two highway policemen testified that Pruitt did so state to them in a conversation shortly after their arrival upon the scene. Pruitt was asked:
"Isn't it also a fact that the truck, when it turned off of the Mansfield Road onto Hollywood, made a wide sweeping turn and at all times was on its right side of the road?"
He answered:
"I don't know. It didn't seem to me like it could have been possible."
In other respects the weight of his testimony is unfavorably affected because of equivocation.
Mrs. Hurn's testimony, as we view it, does not implicate the truck as responsible for the accident. Describing the accident, she says:
"I was looking straight ahead, looking at the sign 'Kickapoo'. So when I felt the jar I looked up and here was that big old Esso truck and I thought it was going to get on us in spite of everything. It seemed like it made a turn from the Mansfield Road around like this, you see, and we *Page 544 
were coming this way, so it crowded us off in the ditch."
It is evident that she felt the jar before she saw the truck, at which time it was evidently passing the coupe or had passed it. However, she is sure that only Pruitt's quick action in veering the coupe to its right averted a collision. She also stated: "There was not very much space between us and that truck". This does not indicate that at any time a head-on collision, as contended, was imminent.
Plaintiff testified very much as did Pruitt. She was certain that the truck did not come to a stop or even slow down prior to making the turn into Hollywood Avenue; that she saw no signal on the part of the truck driver indicative of the intention to turn; that at the time she first observed the truck, the coupe was moving slowly, crossing the west railway track, and that she, about that time, told Pruitt to "get over a little. It was either move a little to the right or meet the truck", that he did then pull slowly to his right and went into the ditch as a consequence.
The driver of the truck has operated vehicles of that character for twenty-one years, and only recently received a safety award for careful driving. He was well acquainted with the intersection and its physical conditions. The truck and trailer, with over-all length in excess of thirty feet, when carrying a heavy load, could not safely negotiate the left turn into Hollywood Avenue without coming to a stop or slowing down materially. Of course, it was necessary to take one or both actions in order to observe traffic conditions in all directions. Holder is positive he did this. Barron, who at the time of trial was a student in a business college, and surely has no reason to color his testimony, fully agreed with Holder as to the manner and method of making the turn. Both testified that the truck and trailer were well on their side of the avenue at all times after emerging from the intersection. Each testified that as the coupe passed the truck, Holder observing that Pruitt was bearing too far to his right, extended his head out of the door of the cab and shouted to Pruitt that he was headed for the ditch, or words to that effect.
The truck was stopped immediately after the accident. Holder testified, and we have no reason to disbelieve him, that immediately after the train struck the coupe, in order to comply with a fixed rule of its company, he prepared a statement for Pruitt to sign, which exonerated Holder from any responsibility for what had just happened; and as he as about to sign the document plaintiff approached and told him not to sign a "damn" thing, and he followed her suggestion.
The culvert involved in this suit, as reflected from photographs, did not extend as far north of the edge of the avenue as it should have done. Pruitt did not know this and doubtless assumed that the culvert was longer that it really was. He was in a hurry to get upon the highway, and to this, augmented by his erroneous belief as to the length of the culvert, should be accredited the accident.
The lower court evidently reached the conclusion that the testimony did not clearly preponderate in favor of plaintiff on whom rested the burden of proof. Our study of the record convinces us beyond question that the lower court's resolution of this question of fact is correct. Therefore, for the reasons herein assigned, the judgment from which appealed is affirmed with costs. *Page 683